OPERA ON TOUR, INC., Appellant, *v.* JOSEPH N. WEBER, as President of American Federation of Musicians, et al., Respondents.

Argued December 3, 1940; decided April 24, 1941.

*Julius Weiss, John Kadel* and *Selig J. Silverman* for appellant.

*Henry A. Friedman* for respondents.

FINCH, J. The question presented for decision is far reaching and of vital importance to the best interests of unions of employees, of employers and of the general public. The only issue is whether the leaders of the defendant unions were engaged in promoting a lawful labor objective when the Musicians' Union induced the Stagehands' Union to join in a combination to destroy an enterprise solely because of the use of machinery in the production of music in place of the employment of live musicians.

There is no issue involved in this case of a possible compromise. The defendant Musicians' Union refused all offers of compromise made by the plaintiff. The position of the Musicians' Union cannot be better stated than it is in a letter from that union to the Stagehands' Union: " Our Federation is not in a position to compromise this matter * * * nothing short of ceasing to use canned music can be considered as safeguarding the interests of our organization."

This position was adopted and resolutely held even though such adherence destroyed plaintiff's business. The result was the loss of employment of over fifty stagehands, actors and singers, even though this business, which was being destroyed, had created new opportunities of employment where none had existed before.

At the outset we note that there is in the decision of the case at bar no denial of the right to strike. On that issue our decisions are not in doubt. (*May's Furs & Ready-to-War, Inc.*, v. *Bauer*, 282 N. Y. 331; *Goldfinger* v. *Feintuch*, 276 N. Y. 281.) Individually and collectively, the members of any union may at any time refuse to work, because machinery is employed or for any other reason, and may strike in so doing. The members of these unions are free to refuse to work if they object to working in the presence of a machine. But what is here enjoined is the inducement by the Musicians' Union of the Stagehands' Union to enter into a combination to destroy the business of the plaintiff solely because machinery instead of live musicians is used. Here the members of the Stagehands' Union were ordered and coerced to leave the employ of the plaintiff, causing the ruin of plaintiff's business and the destruction of the opportunity of employment of a larger group of stagehands, actors and singers, and the denial to the public of an opportunity to enjoy the benefits of the classic operas. This, even though the members of the Stagehands' Union were not dissatisfied with respect to wages, hours or terms and conditions of their employment, and no controversy existed or exists between them and plaintiff.

After a trial at Special Term, it was found upon sufficient evidence that plaintiff was engaged in the business of rendering performances of grand opera with an orchestral accompaniment of music mechanically reproduced from records instead of by an orchestra of live musicians. The purpose was to make grand opera available in those cities and towns of the United States which could not afford otherwise this form of entertainment because of the prohibitive cost of transporting a grand opera orchestra. Each of the two defendants is a labor union.

It was found that the members of the defendant unions had no other grievance of any kind, nor did there exist any controversy except this demand to discard machinery, between plaintiff and the defendant unions. The defendant Musicians' Union threatened to and did put plaintiff out of business solely because of the use of recorded music. The defendant Musicians' Union induced the defendant Stagehands' Union to order its members to cease rendering any service to plaintiff, which order had to be obeyed by the members of the defendant Stagehands' Union since over ninety-five per cent of the theatres and auditoria in the United States are closed shop, and without membership in the defendant Stagehands' Union the latter find it practically impossible to obtain employment. In addition, the defendant Musicians' Union ordered that no member of that union render services to plaintiff, and caused the American Guild of Musical Artists to order its members not to render services to plaintiff, and members of the Stagehands' Union not to accept employment from plaintiff. If they had not been so ordered, the members of the defendant Stagehands' Union would have continued to render services to plaintiff. As a result of this conspiracy between the two defendant unions, plaintiff was unable to fulfill its bookings and its contracts which had already been made and was prevented from entering into further engagements for the presentation of opera, and in consequence thereof this entire enterprise was forced to come to a complete stop. It was likewise found at Special Term that there was no labor dispute or controversy between the defendant unions and plaintiff, or between any member of those unions and plaintiff, and that the case did not involve or grow out of a labor dispute between plaintiff and these defendants, the only contention being the demand and refusal to cast out machinery.

An injunction was thereupon granted restraining defendants from interfering directly or indirectly with the business of plaintiff, and from ordering and coercing any person or persons to cease performing service for plaintiff, and from

ordering and coercing employees of plaintiff to leave the employ of plaintiff, on the ground that plaintiff uses records or transcribed or mechanically reproduced music in connection with its performances, and from entering into a conspiracy with any group or organization having as its object the destruction of the business of plaintiff for the aforesaid reason, namely, to prevent the rendition of any services to plaintiff, on the ground that plaintiff uses music reproduced by machinery in connection with its performances.

Does this demand of these defendant unions, that plaintiff discard machinery in the interest of the immediate employment of a few individuals, constitute a lawful labor objective? If the acts of these unions have any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment or for the protection from labor abuses, then the acts are justified. (*National Protection Association* v. *Cumming*, 170 N. Y. 315; *Bossert* v. *Dhuy*, 221 N. Y. 342; *J. H. & S. Theatres, Inc.*, v. *Fay*, 260 N. Y. 315; *Goldfinger* v. *Feintuch*, 276 N. Y. 281; *May's Furs & Ready-to-Wear, Inc.*, v. *Bauer*, 282 N. Y. 331; *Baillis* v. *Fuchs*, 283 N. Y. 133.) If on the other hand the labor objective here sought is illegal and not a lawful labor objective, since it has no reasonable connection with wages, hours, health, safety, the right of collective bargaining, or any other condition of employment or for the protection of labor from abuses, then there is no immunity for injury inflicted by a labor union. For such activities labor is not free from legal responsibility. " * * * *prima facie*, the intentional infliction of temporal damage is a cause of action, which, as a matter of substantive law * * * requires a justification if the defendant is to escape. * * * " (Mr. Justice HOLMES in *Aikens* v. *Wisconsin*, 195 U. S. 194, 204.)

The self-interest of labor, like the self-interest of any other body, receives immunity only for those objectives which have a legitimate and reasonable relation to lawful benefits

which the union is seeking. When the labor objectives are illegal, the courts must control, otherwise there are bodies within our midst which are free from the provisions of the Penal Law. When doubt arises whether the contemplated objective is within the legal sphere, or without and so illegal, it is for the courts to determine. In *Exchange Bakery & Restaurant, Inc.,* v. *Rifkin* (245 N. Y. 260, 262) we said: " If, however, any action taken is concerted; if it is planned to produce some result, it is subject to control. As always, what is done, if legal, must be to effect some lawful result by lawful means, * * *." By way of illustration, the courts condemn the combined effort of employees to coerce an employer to pay a stale or disputed claim, even though it might be to the self-interest of the striking employees. (*Dorchy* v. *Kansas,* 272 U. S. 306.) So a conspiracy is illegal involving extortion or to force the employer to commit a crime; or one where the intent to injure rests solely on malice or ill will. Or if those engaged in police duty or in the armed forces should conspire in the face of an emergency or otherwise to coerce others to cease maintaining law and order or defense. A secondary boycott has always been held to be an illegal labor objective. (*Auburn Draying Co.* v. *Wardell,* 227 N. Y. 1, 11.) Harm done to another or to the public may be countenanced only if the purpose, in the eye of the law, is sufficient to justify such harm.

So in *Scavenger Service Corporation* v. *Courtney* (85 Fed. Rep. [2d] 825), a labor union joined an employers' association to prevent plaintiff from price cutting in performing scavenger service in the city of Chicago. This labor objective was held unlawful.

To make impossible the continuance of a business and thus to prevent the employment of a full complement of actors, singers and stagehands merely because a machine is not discarded and in place thereof live musicians employed, is not a lawful labor objective. In *Hopkins* v. *Oxley Stave Co.* (83 Fed. Rep. 912) the labor objective sought was to abandon certain machines for hooping barrels which

materially lessened the cost of making the same. The introduction of the machine actually resulted in the dismissal of certain employees, and the court held the labor objective unlawful.

In *Haverhill Strand Theatre, Inc.*, v. *Gillen* (229 Mass. 413) the owner of a motion picture theatre used an organ played by hand during the presentation of its pictures. A union sought to compel the use of an orchestra of five pieces. The Supreme Court of Massachusetts held that defendants were guilty of an unlawful labor objective.

For a union to insist that machinery be discarded in order that manual labor may take its place and thus secure additional opportunity of employment is not a lawful labor objective. In essence the case at bar is the same as if a labor union should demand of a printing plant that all machinery for typesetting be discarded because it would furnish more employment if the typesetting were done by hand. We have held that the attempt of a union to coerce the owner of a small business, who was running the same without an employee, to make employment for an employee, was an unlawful objective and that this did not involve a labor dispute. (*Thompson* v. *Boekhout*, 273 N. Y. 390.) So, too, in a case just unanimously decided, we held that it was an unlawful labor objective to attempt to coerce a peddler employing no employees in his business and making approximately thirty-two dollars a week, to hire an employee at nine dollars a day for one day a week. (*Wohl* v. *Bakery & Pastry Drivers Union*, 284 N. Y. 788.)

Since the endeavor to prevent the use of a mechanical device bears no reasonable relation to wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment or for the protection of labor from abuses, there is no labor dispute within either the letter or the spirit of the Civil Practice Act. (Civ. Prac. Act, § 876-a, subd. 10; *Thompson* v. *Boekhout*, 273 N. Y. 390; *Luft* v. *Flove*, 270 N. Y. 640.) In other words, there is involved in the case at bar solely the demand that a new enterprise shall not make use of machinery in

order to create places for live musicians. Neither in the previous judicial decisions of this court has it been held, nor in any statute enacted, that a dispute is a labor dispute which has no connection with or relation to terms or conditions of employment, collective bargaining, protection from abuses, or respective interests of employer and employee. In the case at bar there is no actual employment at all. There is the use of a machine in place of a human relationship between one individual and another. Section 876-a (subd. 10, par. c) defines a labor dispute as any controversy concerning terms or conditions of employment, or concerning representation in arranging terms and conditions of employment, or any controversy arising out of the respective interests of employer and employee whether they stand in such relationship or not. All these words assume the existence of a human relationship. The words of this statute *eo nomine* relate to terms or conditions of employment, the right of representation for purposes of collective bargaining concerning such terms and conditions of employment, and the respective interests of employer and employee. Such respective interests of employer and employee must be interests that grow out of or have some relationship to employment. Advantage not connected with employment is not the interest referred to in the statute. To coerce an employer to commit a crime, or to pay a stale claim (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260, 262; *Dorchy* v. *Kansas*, 272 U. S. 306), even though the payment of such a claim may be to the material advantage of the employees, does not make such actions labor disputes or bring them within the terms of the phrase " the respective interests of employer and employee " and thus overrule the previous decisions of this court and of the Supreme Court of the United States. The cases of *Goldfinger* v. *Feintuch* (276 N. Y. 281), *May's Furs & Ready-to-Wear, Inc.*, v. *Bauer* (282 N. Y. 331) and *Baillis* v. *Fuchs* (283 N. Y. 133) were all cases where a mere inspection of the questions presented shows the legitimate and real labor

interests there involved. Thus the previous decisions of this court have recognized that there are unlawful labor objectives and that the courts must take cognizance of the difference between an unlawful objective and an objective which has some legitimate connection with terms or conditions of employment or concerning an interest of an employer or employee, even though the parties concerned do not themselves stand in an employer-employee relationship.

There is in the case at bar no question raised concerning the dismissal of any employee on account of the introduction of machinery. In *Scavenger Service Corporation* v. *Courtney* (85 Fed. Rep. [2d] 825), decided since the enactment of the Norris-LaGuardia Anti-Injunction Act, it was held that the labor objective, to compel the discontinuance of price cutting, was an illegal labor objective. This was so held notwithstanding the claim that price cutting practices tended to depress the wage scale and thus involved an economic dispute. A labor dispute is an economic dispute, but not all economic disputes are labor disputes. In the *Scavenger* case the court said: " We are clearly of the opinion that no labor question is involved, and the District Court was not therefore denied jurisdiction by reason of the Labor Injunction Act (Norris-LaGuardia Act, 29 U. S. C. A. §§ 101–115). Three decisions of this Court (citing cases) are decisive of this question. By no stretch of reasoning can we find a labor question involved in this controversy " (p. 832).

A majority of the Appellate Division sought to limit the effect of the question herein decided by stating that they were passing solely on the right of the defendants to stop work in protest against the use of mechanical music. As we have pointed out earlier in this decision, the right to strike is not involved in this case. Also the right to strike does not prevent the issuance of an injunction against a continuance of the unlawful labor objectives sought herein by the defendant unions. The leaders of a labor union

cannot make an illegal objective legal merely by the use of a legal method (the strike) to obtain that objective.

An attempt was made to rest this appeal on the employment of one Schavitch, against whom the Musicians' Union has a grievance, as well as upon the employment of a non-union pianist. This issue was found to be belated and was brushed aside by both the majority and minority in the Appellate Division and need not concern us here.

It follows that the judgment of the Appellate Division should be reversed and that of the Special Term affirmed, without costs.

LEHMAN, Ch. J. (dissenting). The defendant American Federation of Musicians (hereinafter referred to as the Musicians' Union) is an unincorporated association which, according to its constitution, " shall consist of local unions of musicians, the individual musicians who form such local unions, and conditional members as conform to its rules and regulations, as well as such organizations active in the field of music which may be granted a charter of affiliation with The American Federation of Musicians." Its declared purpose is to unite " all local unions of musicians, the individual musicians who form such local unions and conditional members of the American Federation of Musicians into one grand organization for the purpose of general protection and advancement of their interests and for the purpose of enforcing good faith and fair dealing, as well as consistency with union principles, in all cases involving or of interest to members and local unions or the Federation."

The defendant International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States (hereinafter referred to as the Stagehands' Union) is an unincorporated association, consisting, as found by the trial court, " of persons employed as stagehands, stage technicians and stage electricians (hereinafter called ' stagehands '); that the said union is the parent organization which has approximately seven hundred (700) locals in the United States and Canada."

The plaintiff is a corporation organized to present public performances of grand opera upon the stage. It presented performances of the grand opera " Faust " in several cities in the Southern States, and employed more than fifty singers, choristers, dancers and other performers in connection with these performances. It also employed a permanent crew of six stagehands who were all members of the defendant Stagehands' Union, and, in addition, employed local stagehands in the various cities and towns in which plaintiff produced its opera, to supplement its permanent crew. The stagehands employed locally were members of the defendant Stagehands' Union and were hired through the respective locals of the defendant Stagehands' Union.

The music, traditionally produced by an orchestra composed of instrumental musicians, was mechanically reproduced from records previously prepared for plaintiff's use. Mechanical reproduction of recorded music as a substitute for the traditional orchestra of living musicians had not been attempted previously in connection with any similar stage performances. The Musicians' Union, concluding that mechanical reproduction of recorded music, as part of a stage production, would result in decrease of employment of professional musicians, objected for that reason to the plaintiff's use of recorded orchestral music. The Musicians' Union and the Stagehands' Union are both members of the American Federation of Labor. They had agreed that in specified contingencies either party to the agreement might call upon the other to render " all moral support " in its controversies with an employer, and in some cases co-operation that might go beyond " moral support." For the purpose of compelling the plaintiff to abandon its use of such mechanical reproduction of music, the Musicians' Union called upon the Stagehands' Union for co-operation and that union, in turn, ordered its members not to render any service to the plaintiff. The plaintiff has demonstrated that it could present stage performances of grand opera without employing any members of the defendant Musicians' Union but it cannot continue to conduct its business and

to present stage performances of grand opera so long as the members of the Stagehands' Union refuse employment by it. Claiming that " unless the defendants are enjoined, at first during the pendency of this action and afterwards permanently, from continuing their unlawful practices, from the carrying out of the aforesaid conspiracy, and from prohibiting the members of the defendant, International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators of the United States and Canada, to perform services to the plaintiff, plaintiff's business will be completely destroyed and an injunction during the pendency of this action is accordingly imperative," the plaintiff has brought this action for an injunction.

After trial the court at Special Term granted the injunction which the plaintiff asked. The Musicians' Union, " its officers, members, agents, servants, employees, representatives and attorneys " and the Stagehands' Union and its " officers, members, agents, servants, employees, representatives and attorneys " have been permanently enjoined and restrained, among other things, " from interfering with plaintiff's employees and from directing, ordering, instructing or advising any person or persons to cease performing or not to perform services for the plaintiff, Opera on Tour, Inc., and from inducing, causing or procuring in any manner or by any device whatsoever, any person or persons or organization, association, corporation or group of which any of plaintiff's employees may be a member or may be affiliated with or any group or groups of plaintiff's employees to leave or not to enter the plaintiff's employ or to cease performing services for the plaintiff or to cause or induce its members or others to leave or not to enter the plaintiff's employ or to cease performing services for the plaintiff on the ground that, or for the reason that, the plaintiff, Opera on Tour, Inc., uses recorded or transcribed or mechanically reproduced music in connection with its performances " and both defendant unions have been directed " forthwith to cancel each and every resolution, order, instruction, notice, message, or other communication heretofore given or

sent, ordering, directing, instructing, advising, inducing or causing any person to cease performing services for or not to perform services for the plaintiff, Opera on Tour, Inc., on the ground that the plaintiff, Opera on Tour, Inc., uses recorded or transcribed or mechanically reproduced music in connection with its performances or on any of the other grounds heretofore mentioned " and also " forthwith to notify those heretofore affected by such resolutions, orders, instructions, notices, messages, or other communications heretofore given or sent, of the cancellation of the same." The Appellate Division by a divided court reversed the judgment of trial court and dismissed the complaint.

There is no substantial controversy about the facts, and the problem presented upon this appeal is a simple problem. The plaintiff desires to conduct its business by the use of mechanical devices which will produce a result that could otherwise be obtained only by the employment of musicians. It produced evidence to show that it would not be economically possible to conduct its business unless it can use the mechanical devices. The two defendant unions have determined that the use of mechanical devices for reproducing recorded music increases unemployment of members of the Musicians' Union, and perhaps, indirectly, of members of affiliated unions engaged in stage productions. To compel the plaintiff to abandon the use of such devices, the Stagehands' Union, at the request of the Musicians' Union, has ordered its members not to work for the plaintiff. The question presented upon this appeal is whether a union or a combination of unions may be prohibited from calling a strike for such a purpose.

Judge FINCH concedes in his opinion that " individually and collectively, the members of any union may at any time refuse to work, because machinery is employed or for any other reason, and may strike in so doing " and that a denial of the right would be in conflict with our decisions in *May's Furs & Ready-to-Wear, Inc.*, v. *Bauer* (282 N. Y. 331); *Goldfinger* v. *Feintuch* (276 N. Y. 281). He adds, however, that " what is here enjoined is the inducement by the

Musicians' Union of the Stagehands' Union to enter into a combination to destroy the business of the plaintiff solely because machinery instead of live musicians is used."

There is no evidence in the record and there is no finding that the Stagehands' Union was induced by the Musicians' Union to enter into a conspiracy *to destroy the business* of the plaintiff because machinery instead of live musicians is used or for any other reason and the judgment does not enjoin inducement by the Musicians' Union to enter into a combination to destroy the plaintiff's business. It does, as heretofore pointed out, enjoin both unions and *each of them* "from interfering with plaintiff's employees and from directing, ordering, instructing or advising any person or persons to cease performing or not to perform services for the plaintiff * * * on the ground that, or for the reason that, the plaintiff * * * uses recorded or transcribed or mechanically reproduced music in connection with its performances, or on the ground that plaintiff uses foreign made records in connection with its performances, or on the ground that plaintiff uses transpositions or copies of records, or on the ground that Vladimir Schavitch is connected with or employed by plaintiff as artistic director to synchronize the voices of singers and performers with recorded, transcribed or mechanically reproduced accompaniment, or on any other ground which has its origin in or is due to steps or actions taken by the defendant unions to prevent the use by plaintiff of recorded or transcribed or mechanically reproduced music in connection with its performances." It does not refer directly or indirectly to any combination to destroy plaintiff's business for the very good reason that there has never been any claim, evidence or finding that the defendants conspired to produce that result. It seems to me that it is an injunction against a strike and nothing else. In fairness to the plaintiff and its attorneys, to the justice at Special Term and to the dissenting justices in the Appellate Division, there has not heretofore been any suggestion in the complaint, in the findings, in the opinions in the courts below or in the brief of the appellants that the defendant

unions combined or conspired to destroy the plaintiff's business.  The trial justice found " that the defendants Musicians' Union and Stagehands' Union combined and conspired *to force plaintiff to abandon its use of recorded orchestral music.*"  That was the sole purpose of the concerted action of the two unions and if that purpose was lawful, agreement or concerted action, though called a conspiracy, to achieve that purpose is not unlawful.  Though there is evidence and the trial justice found that the Musicians' Union " threatened to put plaintiff out of business unless it abandoned its use of recorded orchestral music " the undisputed evidence and the findings conclusively establish that the purpose of the unions was to prevent the use of recorded music as a substitute for music played by members of the Musicians' Union and the threat was only to use the full power of the unions to achieve that result.

The evidence establishes beyond possible contradiction, and the Appellate Division has found, that " the actions of the defendants were all in good faith, without malice or ill-will, without primary or direct intent to injure or destroy plaintiff's business, without fraud, force, coercion or intimidation of any kind, in the honest belief that such actions were necessary for the protection of the employment opportunities of their members, in furtherance of their economic interest in the continued employment of those in allied trades, and there was no effort on the part of the plaintiff to dispute the good faith of defendants."  Any threat which the Musicians' Union may have made " to put plaintiff out of business unless it abandoned its use of recorded orchestral music " was concededly made without personal malice against the plaintiff, but solely to promote what the officers of the union in good faith believed to be for the best interest of the members of the unions, and the threat involved no implication that the unions would use any means to carry it out other than an order issued by the Stagehands' Union to its own members not to work for the plaintiff or any other employer using mechanical or canned music in connection with stage performances.

The evidence justifies an inference that the plaintiff corporation was not organized or conducted primarily for profit but rather to present as a public service performances of opera in communities which could not pay the cost of performances if an orchestra of musicians were employed at union wages. We may assume, too, that if the defendants, or either of them, may lawfully order the members of the Stagehands' Union to refuse to serve the plaintiff, the plaintiff cannot resume performances, and as a result the members of the Stagehands' Union, and other employees of the plaintiff, will be deprived of opportunity to work, while no additional members of the Musicians' Union will gain employment. We may assume, too, that if such question is within the competency of the court in this action, it might find that compulsion by the members of the Musicians' Union or their friends to stop the use of mechanical reproduction of recorded music is not in the best interests either of the musicians or of the general public, that the chosen leaders of the unions ignore the irresistible power of economic and social forces. Even then the question would remain whether a court may compel a union to cancel an order to its members to strike, for the purpose of compelling an employer to abandon the use in his business of a mechanical device as a substitute for human labor — even where there is evidence sufficient to justify the conclusion that without such use the employer could not and would not continue his business and the result would be deterimental to the interests of the public yet without economic benefit or improvement in the working conditions of the striking employees or of the members of their union or of any other union.

I have posed the question in form designed to be as favorable as possible to the employer seeking an injunction — perhaps in form more favorable to the employer than is justified in this case by the evidence or by any findings that might be based upon the evidence. I have done so because in my opinion the injunction issued by the court at Special Term constitutes an intrusion by the court into a field from which it is excluded under the law of the State

as formulated in an unbroken line of judicial decisions, by statute of the Legislature, and by the Constitution; and the fundamental principles involved should not be obscured, or the discussion complicated, by any question whether the reversal by the Appellate Division was dictated or might be justified upon principles less fundamental or far reaching. It is said that the courts should not sanction a strike to compel an employer to do something which he is unwilling to do, which will work ruin to him, injury to the public, and will confer no benefit upon the members of the defendant unions. I start discussion of the problem with the argumentative concession that if denial of an injunction constitutes sanction of the acts of which complaint is made, if the courts have *authority* to prohibit concerted action whenever concerted action constitutes an unwise or tyrannical abuse of power or, for any other reason, is contrary to the best interests of the public, then it cannot be said that the court at Special Term, in granting the injunction, acted without substantial ground.

Individual freedom of action, either alone or in concert, may be restricted or regulated in the public interest by statute or Constitution. Except as limited by the Constitution, the Legislature may prohibit action which in its opinion should not be sanctioned and outlaw conduct which previously was lawful; or the Legislature may sanction, and render lawful, conduct which previously was subject to penalty. Men combine in associations or unions to exercise in concert an influence or power which enables them to accomplish purposes and ends which, acting singly, they could not effect. The economic, social and political consequences of powerful combinations, large or small, of capital or of labor, of producers, of dealers, or of consumers, are profound, when, perhaps, even without the use of unlawful means, such combinations exert compulsion or pressure upon others to do their will — to pay prices which the combination demands, or to sell at prices which the combination is willing to pay, to conduct their businesses and, at times, to live their lives in accordance with the will of those who

direct the combinations. The welfare and the happiness of the community — even the continuance of orderly democratic government — may depend upon the extent to which the influence or power of such combinations are used wisely and unselfishly to promote the public good or blindly to promote selfish ends at the expense of the common good. The Legislature exercising its power, within the frame work of the Constitution, to promote the public welfare may restrict or enlarge the field within which such combinations may lawfully act, the purposes which they may lawfully promote, and even the means which they may lawfully use; and its actions there may properly be dictated by its considered opinion of the economic, social or political consequences and the effect upon the public welfare of combinations to achieve particular ends. Because the Legislature has such power and its action may properly be dictated by such considerations, a discriminating electorate will be guided in its choice of members of the Legislature by the economic, social and political opinions of the candidates.

The courts have no such power. A unanimous court approved and based their decision in *Interborough Rapid Transit Co.* v. *Lavin* (247 N. Y. 65, 74) on the statement in the opinion in that case that " Demands of workmen may sometimes be fair and sometimes unfair. *Combinations give the workmen a power of compulsion which may work harm to their employer, the public and even to themselves.* Where the workmen do not combine they may be compelled by force of economic circumstances to accept unfair terms of employment. Such conflicting *considerations of economic policy are not primarily the concern of the courts.*" (Italics are new.) We have said, too, that " A workman may leave his work for any cause whatever. He need make no defense, give no explanations. Whether in good or bad faith, whether with malice or without, no one can question his action. What one man may do, two may do or a dozen, so long as they act independently. If, however, any action taken is concerted; if it is planned to produce some result,

it is subject to control. As always, what is done, if legal, must be to effect some lawful result by lawful means, but both a result and a means lawful in the case of an individual may be unlawful if the joint action of a number." (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260, 262.) The primary concern of the courts in such case is whether the end sought is "lawful." In some cases where the dividing line between the lawful and the unlawful is uncertain, a judge, in defining what is lawful, will, perhaps inevitably, be influenced by his own economic, social or political views. Nevertheless, the function of the courts is to vindicate conflicting legal rights in accordance with legal principles, not in accordance with the views of the judges in the court on economic or social questions. The legal principles which the courts should apply where concerted action by the members of a labor union is challenged, have been formulated in the past in authoritative decisions of the court and judicial decision has been supplemented by legislative decree. In my opinion the assertion of authority by the court in this case to enjoin the defendant unions from calling a strike of their members does not accord with judicial decision and legislative decree, which this court has said is valid under the Constitution.

Consideration of the effect of the legislative decree may profitably be postponed until the effect of earlier judicial decisions of this court has been discussed. I emphasize " of this court " for, though the decisions of this court in cases involving the power of the court to enjoin a union from ordering a strike to achieve labor objectives which, in the opinion of the judges, are perhaps not in the true interest of the striking employees or of the public, accord, I think, with the weight of authority in other jurisdictions, yet in some jurisdictions — and notably the Supreme Court of Massachusetts, as I shall show hereafter — have, by a different approach to the problem, at times reached conclusions inconsistent with the concepts of law long and consistently accepted by this court. (See " The Labor Injunction," by Frankfurter and Greene, p. 29; *Stearns Lumber Co.* v. *Howlett*, 260 Mass. 45, at p. 65.)

Here the objective sought is to compel producers of stage performances to abandon the use of mechanical devices which take the place of human labor. I agree with the statement in the opinion of Judge FINCH that " in essence the case at bar is the same as if a labor union should demand of a printing plant that all machinery for typesetting be discarded because it would furnish more employment if the typesetting were done by hand." As in the case suggested the union is asserting a right " to insist that machinery be discarded in order that manual labor may take its place and thus secure additional opportunity of employment," and though in the suggested case the injury to the public would perhaps outweigh more overwhelmingly possible benefit to labor, the difference is one of degree, not of principle, and if the courts are free to weigh the interest of the public against the self-interest of the union members, then argument not without force may be made to sustain the decision of the court at Special Term.

I assume argumentatively that the unions have no dispute with the employer concerning the wages, hours of employment, health, safety, right of bargaining, or other incident of the employment of any member of the Stagehands' Union or any other person presently in the employ of the plaintiff, and that the objective of the strike is not to improve the conditions of such employment, but to compel the employment of more musicians by stopping the use of musical devices " operated," as Judge FINCH points out, " in place of the employment of live musicians." That the use of machines which displace men causes unemployment among those displaced is obvious; though at times the resultant saving of labor cost may so increase sales of the product that loss of employment by one set of workers may be offset by increased employment of other workmen or benefit to the public may, in the minds of reasonable men, far outweigh the harm caused by loss of employment in the group displaced by the labor-saving machine. In this case it was shown that the number of professional musicians employed in public performances has been

enormously reduced by the use of talking machines, radio, or other devices for reproduction of music. Is it unlawful now for musicians and members of affiliated unions, likewise employed in stage productions, to combine to organize strikes with the objective of compelling employers to abandon the use of such devices, and thus stop further inroads and to regain the loss of employment already suffered?

Heretofore this court has unequivocally affirmed the right of workmen to combine for similar objectives. Here is an economic conflict between workers and producers. The workers seek to compel the producers to employ more men than the producers desire to employ, or than are required for the conduct of their business in manner which is acceptable to the public and which will produce greatest profit to the producers. The labor-saving machine displaces labor and reduces costs. That is its purpose. By displacing labor it causes unemployment in some places; by reducing costs it may make it possible to conduct at a profit a business which would otherwise be doomed to failure. A combination to compel the abandonment of cost-reducing devices may thus be a threat of ruin to a business already upon a precarious economic footing. Here it is such a threat to the plaintiff. Almost every strike indeed involves threat of ruin to the employer unless the employer accepts the demands of the strikers, for ordinarily strikes are successful only where the employer concludes that to run his business he must make terms with the strikers. None the less a strike to achieve a legitimate economic purpose cannot be outlawed because if successful some employers will no longer be able to conduct business at a profit; nor is a combination unlawful because it includes all the workers within a trade and thus no employer can find workers who know that trade and are willing to accept employment unless the employer reaches an agreement with the members of the combination. " The purpose of a labor union to improve the conditions under which its members do their work; to increase their wages; to assist them in other ways may justify what would otherwise be a wrong. *So would an effort to increase its*

numbers and to unionize an entire trade or business. *It may be as interested in the wages of those not members or in the conditions under which they work as in its own members because of the influence of the one upon the other.*" (Italics are new.) (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin, supra,* p. 263.)

These principles have been established too firmly and too long to be repudiated now; but we are told that these principles do not apply here because the plaintiff employs no members of the Musicians' Union and, therefore, the combination is not for the purpose of improving the conditions under which the members of that union work and that the evidence supports a finding that the members of the stagehands' unions are not striking to improve the conditions under which they work but solely in order to compel the plaintiff to employ workers whom the plaintiff does not need and perhaps cannot afford to employ. Assuming arguendo that this is true, the conflict is still between an employer and employees who seek to improve the economic position of workmen in their own trade by compelling the employment of more workers. It is an economic conflict, nothing else, and this court has said that " it is not within the province of the courts to restrain conduct which is within the allowable area of economic conflict." (*Stillwell Theater, Inc.,* v. *Kaplan,* 259 N. Y. 405, 412.) Thus the fundamental question here presented is whether in this State a strike to compel an employer to discard a labor-saving device and to employ more human workers is within the " allowable area of economic conflict."

Judge FINCH and the dissenting judges in the Appellate Division have found in *Haverhill Strand Theatre, Inc.,* v. *Gillen* (229 Mass. 413, 417, 418) support for their holding that it is not within that " allowable area," though the appellant does not urge that case as authority here. Perhaps the appellant is wise because, though a similar question was there presented, an analysis of the opinion shows that the decision is based upon doctrines accepted in Massachusetts but repudiated here and in other jurisdictions. The Massa-

chusetts court made entirely clear the question it there determined, stating: " The question propounded to the court by the agreement of parties is this: Is a combination between musicians a legal one by which a plaintiff is compelled to employ a number of musicians specified by the members of the combination if he wishes to employ any member of the combination, even though it be the fact that in plaintiff's opinion the employment of a single musician is the most advantageous way of conducting his (the plaintiff's) business and that the employment of more than one musician will cause him pecuniary loss." To that question the Massachusetts court answered " No." To the same question, this court, in *J. H. & S. Theatres, Inc.*, v. *Fay* (260 N. Y. 315), unhesitatingly and unanimously answered " Yes." (See, also, *Baillis* v. *Fuchs*, 283 N. Y. 133.) Now, for the first time, without pointing out any ground of distinction, it abandons its long-established policy that " it is not within the province of the courts to restrain conduct which is within the allowable area of economic conflict " and ventures to command two unions to cancel an order to their members to strike in order to compel an employer to employ more workmen than the employer (and the court) regard as sufficient and most advantageous.

Judge FINCH finds authority for the injunction also in some cases in the Federal courts and stresses particularly *Dorchy* v. *Kansas* (272 U. S. 306) as a holding that coercion of an employer to pay a stale claim is unlawful " even though the payment of such a claim may be to the material advantage of the employees." In that case the only question presented was whether a statute which restricted or prohibited strikes in the mining industry constituted a denial of the liberty guaranteed by the Fourteenth Amendment if applied to strikes called, as the court pointed out, " to collect a stale claim due to a fellow member of the union who was formerly employed in the business." Such a strike the court said was unlawful and it added that " in the absence of a valid agreement to the contrary, each party to a disputed claim may insist that it be determined only by a

court " (p. 311). There can be no possible inference that payment of a stale claim to a former employee " may be to the material advantage of the employees " and I can find no analogy between a purpose to collect a stale disputed claim of a former employee and a purpose to compel the abandonment of machinery which displaces workmen. I do not pause to analyze the other cases cited. I content myself by stating that as I read those decisions they lend little if any support to the claim of the plaintiff here.

The court's command to the unions to cancel their strike order is not only contrary to the policy of the State as established by an unbroken line of judicial decisions, but it disregards a direct and clear legislative mandate that such a strike is not unlawful and may not be enjoined. No court may under the statute directly or indirectly prohibit a strike, conducted peacefully and in orderly fashion " in any case involving or growing out of a labor dispute." The statute defines a labor dispute as follows: " The term ' labor dispute ' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controvery arising out of the respective interests of employer and employee, *regardless of whether or not the* disputants stand in the relation of employer and employee." (Civ. Prac. Act, § 876-a, subd. 10, par. c.) The validity of the statute is not now challenged. It could hardly be since this court has in careful and comprehensive opinions sustained and applied the statute. (*Goldfinger* v. *Feintuch*, 276 N. Y. 281, opinion by FINCH, J.; *May's Furs & Ready-to-Wear, Inc.*, v. *Bauer*, 282 N. Y. 331, opinion by FINCH, J.; *Baillis* v. *Fuchs*, 283 N. Y. 133, opinion by SEARS, J.)

We are told, however, that the statute does not apply here because there is no labor dispute. Why there is no " labor dispute " here remains a mystery to me. Reliance is placed upon *Thompson* v. *Boekhout* (273 N. Y. 390), where this court held that there can be no labor dispute

where there is no relation of employer and employee and that a strike called to compel the owner of a business to hire employees though he desires to run his business alone is unlawful. Here, however, there was relation of employer and employee, between the plaintiff and the members of the Stagehands' Union, and, therefore, the case of *Thompson v. Boekhout* does not apply. The distinction was clearly pointed out in the opinion by SEARS, J., in *Baillis v. Fuchs* (283 N. Y. 133). Judge FINCH in *May's Furs & Ready-to-Wear, Inc.*, v. *Bauer* (282 N. Y. 331, 339) has pointed out that the statute in explicit terms " provides that if the other requisites are present then a labor dispute shall be found to exist ' regardless of whether or not the disputants stand in the relation of employer and employee.' (Subd. 10-c.) It is undisputably clear that the existence or non-existence of the employer-employee relation cannot be the factor by which to determine the presence or absence of a labor dispute." It follows that the controversy here is no less a labor dispute because the strike of the plaintiff's employees is primarily to assist members of an affiliated union in the same industry in an economic conflict for the purpose of procuring employment. That is a dispute " concerning employment relations " and under the express terms of the statute is clearly a labor dispute. The unambiguous language of the statute and what was said and decided in *May's Furs & Ready-to-Wear, Inc.*, v. *Bauer* (*supra*) leaves, I think, no room for doubt on that point. (See, also, *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.*, 311 U. S. 91, decided November 18, 1940.)

The judgment should be affirmed.

RIPPEY, LEWIS and CONWAY, JJ., concur with FINCH, J.; LEHMAN, Ch. J., dissents in opinion in which LOUGHRAN, J., concurs; SEARS, J., taking no part.

Judgment accordingly.